The first case for argument this morning is 18-1163, Chestnut Hill v. Apple. Ms. Moser, whenever you're ready. Thank you, Ellen. Good morning. May it please the court, I'm Alexis Moser from Caldwell, Cassidy and Curry. I'm very proud to be here on behalf of Chestnut Hill Sound. This morning I have several topics I'd like to cover with the court. They can loosely be grouped into two categories. The first category relates to the problems that we've relayed to the court regarding the board's final written decision. This written decision wholesale adopts Apple's analysis, which in turn relies wholesale on Dr. Mercer's testimony. Essentially, three paragraphs of Dr. Mercer's testimony are supposed to pull together the entire analysis, paragraphs 25 through 27. But those paragraphs are conclusory with scant citations to the record and should not be relied upon. Second, I'd like to spend just a few moments talking about the unconstitutionality of the application of the AIA statute to pre-AIA patents. The board was unable to consider this issue as it was outside the scope of their statutory grant. Thus, we raise it for the first time before this court. As the court has told the board a number of times, it's not enough to simply say, here are the elements of a prior art, and therefore we conclude your patent is obvious. There must be a reasoned analysis to get us from the elements to the conclusion. Our brief is primarily disposed to discussing the analysis based on the standard of known methods leading to predictable results. And this is because that's exactly how Apple and the court and Dr. Mercer evaluated these facts. And while I'm happy also to discuss the grant factors because I feel that the board failed to recite anything relating to factor two, as did Apple and Dr. Mercer. So under either evaluation, I don't believe that we meet the standard for obviousness under the court's jurisprudence. So can we talk about motivation specifically for a while? Sure, Your Honor. So you agree, do you not, that after KSR, it's not necessary to have an explicit written statement in the prior art with regard to motivation? Do you agree with that? I would agree that while it may not be explicit, it cannot be simply a desire to make a better product, which is all that we have here. And without some motivation, even an implicit motivation, there's no reason. What would have been necessary here or sufficient here to establish a motivation? I think establishing a motivation should have been some discovery in the prior art that there was a desire to create this bimodal invention to manage the content in a way that easily and seamlessly transitioned between the first mode and the second mode, providing access in one user interface to both local and remote storage. And I don't think that the record before us shows that they found a motivation to combine the references in this way, whether implicit or explicit. But what kind of implicit? Give me an example, hypothetically, of the kind of evidence that would have to exist in the prior art sufficient to establish this implicit motivation. Somebody saying something? Somebody? I'm just trying to. Your Honor, I haven't considered what would have established an implicit motivation. And that's likely because, obviously, Apple had the burden to bring an implicit motivation or an explicit motivation. And thus, I'm not sure that I'm prepared to answer that question today. But I'm happy to show you why I don't think that Clements and Barton, which are the references I believe that they rely upon, don't provide an implicit motivation. Well, they do. I don't know where this is exactly in the briefing. But they provide, arguably, five different motivations to combine the references, right? Well, I agree that in one paragraph, they recite several things that they allege are motivations to combine. However, these alleged motivations to combine mirror almost exactly the motivations to combine that the court evaluated in the active video case. And if we go look at the court's analysis in that case, we find that those motivations to combine were conclusory and were not substantial enough to reach the result that Apple is proposing here. So example, the expert's testimony on obviousness was conclusive because he didn't provide factual basis for his assertions. He didn't explain how the specific references could be combined, which combinations of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims. And obviously, that doesn't directly answer your question. But the direct answer to your question is, his answer is a motivation to combine would be because you wanted to build something better. You wanted a system that was more efficient, cheaper, or you wanted a system that had more features, makes it more attractive to your customers, because by combining these two things, you could do something new that hadn't been able to do before. And that's almost exactly what Dr. Mercer said the motivation to combine was here. He said you'd want to have less equipment. You'd like to have it in one box with fewer power cords. Isn't that a degree of specificity that does constitute, particularly coming from the mouth of an expert, a real explanation of the factual basis for the motivation? He says that, and I'm reading from paragraph 26 of his declaration, reducing the amount of equipment a user needs to configure and maintain. That seems like a reasonable fact-based reference to why you would want to combine two things together. Ditto reducing the space the equipment consumes and enabling one set of connections to the television. That all seems to me not just conclusory, but to be based on factual considerations that bear on whether this is something somebody would want to do. Well, I think that it is something everybody wants to do. I mean, with the development of the microprocessor, clearly everything is trending towards smaller, more efficient and faster. And I think that's why the active video court said, these elements are generic and bear no relation to any specific combination of prior art elements. And it fails to explain why a person of ordinary skill would have combined elements in the way the claim of invention does. So there's ample- Isn't he explaining that the person of ordinary skill would want to have fewer wires and connections and would want to have a reduced amount of equipment that needs to be configured and maintained? I'm not sure how you get more granular than that. Your Honor, I think that- What are you looking for that wasn't there? I guess I would put it that way. I think the granularity of it is probably irrelevant to the fact that it's simply a statement that you'd like it to be smaller. So a similar statement that would have no import to why this is a motivation to combine would be, I'd like to put the components closer together. It's the same thing. I'd like them to be cheaper because I put them closer together. And I don't think that that is the kind of specificity about why you would combine these references in that way that the court is typically looking for in its jurisprudence. And I think more importantly is the second part of this statement. It fails to explain why a person of ordinary skill in the art would have combined elements from specific references in the way the claimed invention does. And that's sort of the delta between where the prior art was and where our invention was and how you cross that bridge. So we do have these motivations in some form or fashion if I accept the court's interpretation, but those motivations don't necessarily lead us to the combination that's identified in the 309 patent. And the board and the declaration in Apple all rely on, again, as I said, these three paragraphs, 25 through 27, to find that crossing the bridge between the prior art and the invention. But it's simply absent here. What they'd like to rely upon are the references of Clements and Barton. The references of Clements and Barton are only discussed in passing. There's one citation to them in the entirety of the expert report. And the expert doesn't say how these references help us understand the mapping of these claimed limitations from the prior art onto the 309 patent. And the board's decision doesn't give us any more understanding of the analysis of why Clements and Barton lead us to map the prior art onto the claims in any particular way or leads to a predictable result. And this is the thrust of what's missing from this analysis. Without some sort of help getting from point A to point B, we can't have a determination of obviousness. And what I would argue to the board is that in this case, it's even, well, I would say fairly egregious, because Chestnut Hill attempts to develop the record below on exactly this matter. Chestnut Hill notes that he says in his declaration, known methods. And they ask at the deposition, could you please identify the known method that you are saying will get you from point A to point B? And of course, we accept Dr. Mercer's testimony as a technical expert who should have these known methods within his body of knowledge or be able to find them within the prior art references. But if we- One always wonders when you have, when the prior art is in the same field of the invention, and all of a sudden along comes this inventor and takes another step, if it was so obvious to combine these references, why isn't there some sort of suggestion in the prior art that we're looking at? However, technology advances, the problems to be solved are somewhat different. And as things work, the burden now is really to show the contrary, that a person of ordinary skill would not routinely have made this combination. And there we need to show where the board went wrong.  of course. However, I think that in order to reach the point where we as the patentee have to show that it wouldn't have been obvious as an affirmative burden, Apple and the board have to show that it would have been obvious. And as I alluded to earlier, they didn't make that showing here because the second step of, or the second factor of Graham is the differences between the claimed subject matter and the art. And also because the fourth factor of Graham is the secondary considerations which were given short shrift by both Apple and the board. So first, I feel like we've discussed a little bit this idea that the differences between the claimed subject matter and art. And that's that Delta that I keep talking about. For them to be able to force us to provide affirmative evidence why this isn't obvious, they have to show that that Delta is easily crossable. And this is what I was getting at with the idea that Dr. Mercer as a technical expert should have some indication for Chestnut Hill and for the board why they would have been able to make this analysis. In his declaration, the only time he talks about, and I do say known method is how you would make this jump between the prior art and the 309 patent, is paragraph 26, where he states his conclusion that a postida would have modified the device operable to access a DVD jukebox over a network to include the PBR functionality of Baumgartner. Because such a motivation amounts to simply combining prior art elements according to known methods to yield predictable results. And of course, this is the KSR standard, not the gram factors standard. But that's illuminating for our discussion of how you cross this Delta between the claim subject matter and the art. And when we discussed this with Dr. Mercer and said, well, what known method are you referring to in the first sentence of paragraph 26? He says, so what's really being said there, as I think about it, is you have two sets of ideas. Those exist in the mind, a single person probably, or a team, but those are minds. It's a mind or mind of ordinary skill in the art. And then the point here is there's a process of synthesis with respect to any kind of creation. And one common way that synthesis occurs is to take ideas and to put those ideas together, or parts of these ideas, to accomplish something that's different than either one of these ideas by themselves. So this is what Dr. Mercer and Apple and the board rely on in order to say that they can reach the second factor of gram to show that the differences between the claim subject matter and the art are not so substantive as to shift the burden to us to provide affirmative evidence that the patent isn't obvious. And your honor, Judge Newman, you did say that this could be a very small delta. And I don't consider it close, obviously, because this is my client. But if we do consider it close, if we do say it's a small leap, how do you make the leap? How do you get from point A to point B? And don't we, as Chestnut Hill, have a due process right to understand how you're getting from point A to B so that we can provide testimony or evidence to say you didn't make it from point A to B? And that's what's completely lacking here. The board's analysis is expansive on the prior art elements, expansive. But what both they and the declaration are relying on is Barton and Clements to pull it all together. And there are no citations within Barton and Clements to help us understand how you would pull it all together. I see I'm running a little low on time. You're into your rebuttal. Oh, dear. Secondary considerations co-anticipated this completely during the prosecution. The examiner said that. There's no greater nexus than saying it was anticipated. The case that Apple cites to say that it shouldn't be stopped from arguing that, or stopped from applying this, is an estoppel case. So it doesn't tell us anything about how strongly related the patents are. And those secondary considerations are extremely strong and should be considered by the board. Thank you. Thank you. I will reserve the remainder here from the other side. Thank you. Good morning. May it please the court. Just to do a reset here on the claim that we're looking at. This was an extremely broad claim that simply involved a device, a single device, where you would be able to access both local content and remote content. Appellate mentioned something about the ability to transfer seamlessly between the first mode and the second mode. There is nothing in the claims about that. This is simply a device with a first mode that is local content, and an explanation of that, and a second mode. So it was undisputed that every element of the claim could be found in these two prior art references. And it was undisputed that the two prior art references were in the exact field. They both played recorded digital content on television. So then the next question would be, well, where's the motivation to combine those two references, which is much of what your honors were discussing. And the expert in this case, unchallenged, Chestnut Hill presented no expert testimony, detailed at length what that motivation would be, and gave five different motivations, all in paragraph 26. But the motivation is in hindsight. We did combine it. But if it's so clear, how come none of these references even remotely suggest it? There is no, as your honor pointed out in your previous question, under KSR, you don't have to find the motivation from. KSR does not say you never have to show a motivation. KSR says that you look at the facts. And it says you don't have to always find it an explicit motivation. It doesn't say you never needed an explicit motivation. Oh, absolutely, your honor. I was just saying the KSR says you don't have to find it in the prior art references themselves, the two that you're using, for example, that you can find it elsewhere. For example, there are market pressures. There are design pressures to create a single device. And that's what essentially Dr. Mercer was talking about, is that the market gave the motivation to take a device where everybody would like to be able to access both their remote content and their local without having to have two controllers, without having to have- So is it your view that just the same thing over and over again, the reduction in the amount of equipment, the increase in the efficiency, the reduction in the size, or that in and of itself is the motivation that we can just assume with respect to every obviousness case? No, your honor, because we had more here. I mean, we have that, which are very practical motivations. And also that would then enable you to have one remote controller, one plug. Those are all very positive motivations to reduce the device from two into one. But on top of that, what Dr. Mercer pointed out in paragraph 27 of his declaration is that it actually had been done before in other type of media devices. And that's where the citation of Barton and Clements made. He could have just stopped and said, and it's been known to combine them in this fashion in the field full stop, and that would have been sufficient. But as the board found, he enhanced his credibility by actually pointing specific references, Barton and Clements. And I don't think you're what the issue- So Barton is the DVR and the DVD player? Yes, your honor. Okay. And then I think Clements was the PBR. Right, okay, go ahead. And I think what really though we're hearing from Appellant is it's a somewhat shifting argument, which is they don't dispute that there were set out by Dr. Mercer actual motivations. And they don't dispute that the prior art references have all of the elements. What I heard at the end is where Dr. Mercer allegedly failed and therefore why the board's opinion is not supported by substantial evidence is that he failed to say how you would combine those two references. Now that argument first came up in Appellant's reply brief, so we haven't had an opportunity to really respond to it. But assuming what they're saying is that Dr. Mercer and the board failed to explain how physically you would attach Abiezi to Baumgardner, I would respectfully submit that's actually not the law. And I would refer the court, and again, this is not in our briefing because the how came up in the reply brief. But one example that addresses this is the In Re Burwin-Edder case that can be found at 756 F. Second, 852. And in that case, this was in a re-exam proceeding, the same issue came up. And what the court held is that Edder's assertions that Azure cannot be incorporated into Ambrosio are basically irrelevant. The criterion being not whether the references could be physically combined, but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole. And so this how argument that just came up has already been addressed and rejected in the past. But- The patent, as I don't think the claim has any specific reference to any particular way of combining the two. I mean, they could be glued together, they could be nailed together, they could, and they would still, they would all be within the scope of the patent together, right? Absolutely, the patent is silent as to how you even go from one mode to another, or whether you even have to have one mode playing and the other mode not, you could be playing both at the same time. It's a very, very broad claim. And while appellate could cite one portion of Dr. Mercer's testimony on this how issue, I would submit and cite another. At appendix 1194, Dr. Mercer was asked the specific question, can you identify any known methods familiar to a skilled artisan in the first sentence of paragraph 26 of your declaration? And he said, sure. I mean, probably the simplest one is you take two separate things, and if they're compatible, you plug them together. And if they're not compatible, you form some sort of interface and plug them together. So he actually did explain even the physical how of combining Baumgartner and Abbiezzi, even though he wasn't required to. And if we look again at paragraph 26 of his declaration, it doesn't just lay out the motivation as to why, he actually even gets more specific as to the how, and these two references in particular. He says, a posita would have modified the device of Abbiezzi. So he's saying, start with Abbiezzi. He's not just saying, just put them together. Start with Abbiezzi. Operable to access the DVD jukebox over a network and include the PBR functionality of Baumgartner. So he's actually teaching how to physically do this combination. And then he goes on and says, and here we have the why and the how almost kind of merging together, that you would then reduce the amount of equipment that a user would need to configure and maintain. You would reduce the space the equipment consumes in the user's television cabinet. You would facilitate using the devices with a common remote control. So he's teaching, after you put them together, have one remote control. And you would then enable one set of connections to the television. So he's really kind of teaching a physical how, even though again, he's not required to. But what's even more telling is that on page 21 of Appellant's blue brief, they concede, and I wanna get the language exact. There are countless features a Posita could put in a set-top box. Video conferencing, DVR, music jukebox, photo editing tools, home movie storage, et cetera. While a Posita might have the technical ability to combine those features in one box, that does not mean any possible combination of those features is obvious. And we agree. And we're not talking about would it have been obvious to combine in one box photo editing tools with home movie storage. We're simply talking about would it have been obvious to combine in one box the ability to access your local content and your remote content. And the answer is yes. And Appellant has conceded at page 21 of their blue brief that a Posita would indeed have the technical ability to do so. I have one minute left, which I have to give to my counsel if Your Honor wants to hear about the unconstitutionality. The local and remote is, Clemens has that feature, correct? Yes, Clemens also has that feature, Your Honor. But actually, no, this is your time. We gave you 10 minutes on your clock. Oh, you did? Oh, thank you very much. So you haven't cut into the other. I thought I had. Thank you. Then I will go, unless Your Honors have some more questions about that, and describe briefly and address briefly COE and whether or not COE actually provides secondary considerations. So it's interesting because at the board, Appellant argued that COE showed a long-felt need. And the board rejected that and said, no, you didn't do any mapping of COE to the 309 claims. You just looked at the abstract. So it doesn't meet the criteria of you showing a secondary consideration of non-obviousness. Then Appellant, in their blue brief at page 28, says that the PTAP considered COE as a secondary consideration, and they cite Appendix 38. And it's true, they did, because that was what Appellant urged them to do. Now they argue this evidence is not rightly any of these. It is essentially sworn testimony from Apple's engineers regarding the state of the art. So this is a new argument for why you should listen to COE. So then, at page 35 of the red brief, we cite Weyers v. Masterlock, and quote, met what Masterlock's employees subjectively knew or believed at the time they filed their patent is irrelevant. So in other words, this directly addresses their new use of COE. Now on page 17 of the reply brief, Appellant reverts back to arguing that COE is a secondary consideration. And once again, that was rejected by the board because there was no analysis done of COE, simply looking at the abstract of COE without doing any mapping to the 309 claims it issues. So COE is really an irrelevancy here, as the court, as the board rightfully found. Thank you. Thank you very much, Your Honors. Good morning, and may it please the court. Courtney Dixon for the United States. We've intervened to address the constitutional issues. So we've seen this argument before, but it's usually with Ms. Allen, right? Are you the new substitute? We're shaking up the batting order today. As Your Honor mentioned, there are a lot of these cases currently pending before this court.  was with the state of the art. And the state of the art, as you know, was preserved before the board. In this case, of course, Chestnut Hill. Is that the golf something or other case? Agarwal versus Topgolf, Your Honor. That's 18. We heard about that last month when we were on a panel. I know it's starting to sound like deja vu, Your Honor. And of course, we think even if this court reaches the merits, those are easily disposed of. I'm happy to not go into any more detail unless the court has specific questions. I guess I would like to ask one question, which is whether the Department of Justice has settled on a position with respect to the question of whether the board has the authority to decide the constitutionality of the procedure. Well, as we mentioned in our brief, Your Honor, I think this has been consistent across our briefs. We think that absolutely parties can and should raise these issues to the board. I understand that. You've certainly said. But the question on which I think there's been, I don't know if I'd go so far as to say waffling, but there's at least been, for me, some lack of precision and clarity as to the department's position is, how far can the board go by way of doing constitutional analysis in a challenge that's directed to its own procedures? Your Honor, I apologize for any imprecision. And I think it does depend on what you mean by addressing the constitutional question. Of course, we don't think the board could strike down an act of Congress as the board. So you don't think they could strike down an act of Congress? No, Your Honor, but the board could, of course. Well, perhaps it wouldn't have the effect of invalidating the act of Congress. But my question is, can the board say, you know what, we have looked at this, we've analyzed all the constitutional arguments, we believe they are correct. And therefore, we hold that we don't have the power to conduct this proceeding. I think so, Your Honor. And as we've mentioned in these other cases, the board could, of course, decline to institute proceedings if it felt that there was a serious constitutional issue. I'm actually, I've heard you make that argument here. The department made that argument before, but what I haven't heard is whether they could actually say, OK, here's, without saying we're not going to proceed in this case because we're nervous about the constitutional issues, can they implement, can they take a case and then decide the constitutional question front and center? I think they could address it. And an agency, in other words, more broadly, can an administrative agency issue an order saying that its own statute is unconstitutional, whether it's the NLRB, the Merit Systems Protection Board, or the board? I hesitate, I guess, to go too far outside of what we've said in our brief, Your Honor, which is that we think, of course, that the board can address these issues. But you've said in the brief that they can do so by saying we're not going to institute. But you haven't gone any farther than that. I'm wondering whether your position is they could institute in the case and then decide, no, we can't, the statute is unconstitutional. We cannot grant the relief that the petitioner is looking for. I think declining to institute is a version of that, Your Honor. And I would say that it is in court and elegant. Suppose that they institute, and then they decide that they want to reach the constitutional question. I'm just, this decline to institute, I'm not satisfied that that actually grapples with the question of whether the agency has this authority or not. Well, the Supreme Court in Elgin stated that the board or an agency could, of course, reach threshold issues. So if the board had thought that there was a serious constitutional problem, it could, of course, address and set out its views on the issue, as opposed to whether, again, we don't think that it could hold a provision of Congress unconstitutional. We think, as we said, the remedy would be either to decline to institute, which that would be what the board would do. Typically, I mean, the cases we've seen include, I mean, the board wrestles with this issue once they've instituted. So it wouldn't be declining to institute. It would be vacating their institution. Is there a procedure for doing that? Perhaps I'm struggling to answer this question, Your Honor, because it just hasn't happened yet. In the Topgolf case, the board resolved the constitutional issue in a couple of paragraphs by citing to this court's opinion in Patlex. Is there a difference between the actual constitutional question that arises? Because there is. And we've got our, I can't think of the name now, but we've got our precedent. I mean, in some certain, particularly due process issues, the board would have the ability, arguably, to provide relief in certain circumstances. Whereas if it were dealing with the taking issue, not so much, right? So is that a factor that might differentiate, in other words, the type of claim that's being made in terms of what the authority is of the agency? I think the type of constitutional claim manager, Your Honor, and of course this court in DBC, which involved an appointments clause claim, held that claim forfeited when the party didn't raise it before the board, because in that circumstance, the board could have taken actions to correct the constitutional problems raised before it. So I do think that looking claim by claim is a helpful way of approaching this. But here, of course, we think that it could have been raised in the first instance. The board could have addressed several threshold issues, even if it didn't reach the ultimate constitutional question. But of course, if the board were to reach the question, like if we think if this court were to reach the question, the merits are easily disposed of. As we've noted numerous times in our brief, we think the retroactivity question is foreclosed by Patlex. I'll also note that in this case in particular, Chestnut Hill's patent was issued after the effective date of the AIA, so their retroactivity challenge can be rejected on that basis alone. Thank you very much. You've got some rebuttal time. We'll restore two minutes. Your Honors, Apple has characterized our briefing as only belatedly addressing how these references might be combined. How is essentially the known methods of combination, which we assert are not addressed here. Barton and Clements are what they rely on to show that they combined these methods, or excuse me, combined these references and how it would have been done. Barton is a patent that is on its face addressed to digital video recording systems with integrated DVD recordings. If you look at the figures, it doesn't appear on its face to relate and there's no mapping to how it might relate. The only citation in the record is that one line in paragraph 26. Likewise, Clements is even worse. It's a client side caching of streaming media content, so it deals a lot with modulating and demodulating depending on how the content comes in. This is not a mapping of their prior art onto our claims. Essentially, I like to think of this mapping that we are looking for, or the how, or the known methods as kind of like a reverse enablement. Did the expert in this case enable the prior art references to achieve the 309? And he did not. And Apple accuses us of not showing how these known methods would have been combined, or how these references would have been combined. And they say that this testimony on 1194 is enough. You just plug two things in. But clearly, it's more than just plugging two things in. And if you read our patent, figures one and 12 show how we would have plugged them in, plug being the wrong word here. It requires so much more. It requires processors, it requires a discussion of mechanical, electrical, potentially Wi-Fi access in order to meet the limitations of 309. That analysis is not done simply by citing to Clements and Barton and saying, well, something that we say is similar might be out there. They didn't show how it's similar. As to the takings, it's futile to bring them before the board. The board has said repeatedly under your Riggins precedent that they're not gonna hear them, and it's outside the statutory grant, which is what Riggins says. The patent term adjustment, we've argued, predates what should have been the issuance of our patent to June 19th, 2009. It's not uncommon for the government to assign, and I see that I'm over, I beg your indulgence here. But it's not uncommon for the government to view a patent sort of differently in terms of the issue date than the general public would. And I would point you to the Invention Security Act and the Government Use Statute of 1910. Of course, the Government Use Statute of 1910 allowing a takings claim for government infringement and the section 1498 saying that this is keeping everything secret. The patentee has the option to obtain damages for the government's use of a patent prior to its issuance or prior to its application's do it to require withholding under the Invention Secrecy Act. So clearly, as a public policy matter, we have no problem with evaluating the issuance date differently for the government versus the public. Thank you. Thank you. We thank both sides and the case is submitted.